# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 15, 2003 Session

## JAMES L. JACKSON v. JACKSON, JOHNSON & MURPHEY, P.C.

**Appeal from the Chancery Court for Hamilton County**
**No. Part 2 99-0507     Neil Thomas, III, Judge**

### FILED DECEMBER 31, 2003

### No. E2002-02476-COA-R3-CV

---

This litigation is between a former shareholder - later employee - of the defendant accounting corporation. These parties entered into an employment contract together with a deferred compensation agreement. After two years, each party claimed the other was in material breach: the Plaintiff asserted a breach because, *inter alia*, the Defendant refused to treat him as an employee, while the Defendant asserted a breach because the Plaintiff prepared a number of tax returns [66], *inter alia*, for clients of the firm without recourse to the firm. The trial court found that no mutual material breaches had occurred, and that the Plaintiff was entitled to recover the balance of his deferred compensation which had been terminated by the Defendant owing to the Plaintiff's alleged breaches. The judgment is modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Modified**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Lex A. Coleman and Douglas R. Johnson, Chattanooga, Tennessee, attorneys for Appellant, Jackson, Johnson & Murphey, P.C.

Boyd Stewart Jenkins, Chattanooga, Tennessee, Attorney for Appellee, James L. Jackson.

### OPINION

Jackson, Johnson and Murphey, P.C.[hereafter "JJM], is a public accounting firm of which the Plaintiff was a shareholder and officer. In 1996 the Plaintiff injured himself while vacationing in Scotland and thereafter was partially disabled and unable to perform regularly as a public accountant. Because of these circumstances the parties entered into a series of prolix agreements, each of which was effective August 1, 1996.

As pertinent here, the <u>Employment Agreement</u>, created the relationship of employer-employee between these parties and required JJM to provide Plaintiff with a properly equipped office

adequate for his needs as a CPA. For any fiscal year "in which the employee is a full time employee" JJM agreed to pay the Plaintiff's parking expenses, continuing education expenses, professional dues, group health insurance, and automobile expense. For those "final years in which employee is a part time employee" JJM agreed to "pay a percentage of employee's reasonable expenses" for the enumerated obligations, such percentage to "be equal to the number of billable and non-billable hours of employer for the prior month divided by 166."

The Employment Agreement bound the Plaintiff, during its term, to practice accounting solely as an employee of JJM, and for a period of one year following the termination of the Agreement, the Plaintiff agreed that he would not directly or indirectly engage in public accounting in Hamilton County. He further agreed that during the term of the Agreement all work he performed would be billed through JJM. He further agreed that if he violated the covenant not to compete in a material way, as judicially determined, he would no longer be entitled to payments of deferred compensation. The preparation of tax returns and rendering of accounting advice for "friends and family members" was contractually not deemed the practice of accounting if the Plaintiff did not bill for these services.

The Deferred Compensation Agreement, as pertinent here, promised that JJM would pay the Plaintiff annually beginning October 15, 1997, for five years, a sum equal to 15 percent of "JJM's gross collections" for the preceding fiscal year from clients of the Plaintiff. If the Plaintiff was still alive on October 15, 2002, and if the total payments to him were less than $300,000.00, JJM was required to pay, upon the death of the Plaintiff, an *additional amount to him of $300,000.00, less the total of the five annual installments, and less $40,000.00, and less a reduction of 6 percent interest on the five installments.*

The Stock Purchase Agreement memorialized the sale of the Plaintiff's 45 percent ownership interest in JJM to the corporation for $40,000.00. The Stock Purchase Agreement is not relevant to this litigation and will no longer be noticed except incidentally.

As we have indicated, these contracts were designed to minimize the loss of the firm's revenue and asset value, on the one hand, and to provide the Plaintiff, in his disabled condition, with a regular income, on the other.

The Plaintiff was past seventy years of age. He was a public accountant for most of his adult life, and was legislatively licensed as a CPA in 1989; soon after, he acquired his 45 percent interest in the firm for $900.00. He always had the largest client base in the firm, generated the most revenue, and handled the firm's administrative matters.

## The Complaint

These professionals' feathers gradually became ruffled,[1] culminating in the filing of this complaint. The Plaintiff alleged, with no specificity, that "JJM has materially breached" the employment agreement "entitling the Plaintiff to damages" and to "have set aside" the covenant not to compete,[2] because of the unspecified breach.

## The Response

JJM filed an answer, counterclaim and cross-claim. By answer, JJM pleaded that the complaint failed to state a claim for which relief could be granted.[3] It also pleaded that the Plaintiff had breached the non-compete agreement, and had committed fraud and acts of conversion of JJM's property, but with no specificity. By counterclaim JJM sought a declaratory judgment (1) that the covenant not to compete is enforceable in this jurisdiction,[4] and (2) that JJM is not indebted to the Plaintiff on account of his breaches. The cross-claim is no longer viable, except incidentally. It alleged that the Plaintiff was the executor/trustee of certain estates for which he performed professional services, entitling JJM to compensation, and that he had not accounted to JJM for these fees.

## The Findings and Judgment

The trial court found that the mutually-claimed breaches were not material, and thus not redressable. He found that the Plaintiff was entitled to recover "accrued vacation and leave time *in accordance with the firm's manual and unpaid fees due him,*" and that he should receive monthly reimbursement of [auto] expense [some amount less than $375.00 per month] and deferred compensation in "accordance with the agreement." The Plaintiff admittedly had prepared 66 tax returns without accounting for them, and without billing; the trial judge held that JJM "may choose, or choose not to, bill the clients for whom the 66 returns were prepared." The judgment entered pursuant to these findings ordered a recovery by the Plaintiff for $6360.00 plus 10 percent interest per year from April 21, 1997 for accrued vacation and leave time. The Defendant was ordered to account to the Plaintiff for "all monies due him for the fiscal years ending July 31, 1999, and July 31, 2000, the rate and amount of interest to be later determined.[5] The Defendant was permitted to bill the 66 clients for whom the Plaintiff had performed services, and to pay the Plaintiff one-third

---

[1] To paraphrase the observation of the trial judge.

[2] No declaratory judgment was sought, except perhaps by a general demand for other relief. There was no motion for a particularized statement.

[3] This defense was not further pursued, for whatever reason.

[4] This issue is moot.

[5] This and other decretal provisions indicated that the judgment is not a final one, thus raising the specter of a remand. However, the Defendant's Rule 59 Motion, together with the court's action thereon, cured the problem.

plus 15 percent of any fees thus collected other than from the Plaintiff's family members. The Defendant was ordered to pay $297.37 for reimbursement of an insurance premium, and directed to re-issue a check in the amount of $3635.10 for work performed by the Plaintiff on the estate of Daffron with an "accounting by the Plaintiff showing that the Defendant is to receive credit for $683.40 for deferred compensation for fiscal year 1999." Plaintiff was ordered to pay the Defendant two-thirds of $255.00 for services he performed for a trust.

## The Rule 59 Motion and Judgment Thereon

JJM filed a Rule 59 motion, complaining of the court's action in finding that any breaches of either contract were immaterial, and that the court should have found that the Plaintiff made the first uncured breach, when he prepared 66 tax returns without accounting to JJM. The motion also raised the issue that the Plaintiff did not seek an accounting, as ordered by the court.

The motion was granted, and the parties were allowed to present additional proof respecting the alleged breaches of the Plaintiff as to the diversion of clients and damages resulting therefrom. Further testimony was heard in March and August 2002, resulting in an order which recited that

1.    The motion to alter or amend the judgment is denied.
2.    Rather than account to Plaintiff as heretofore referenced . . . the Defendant will pay $55,057.05 in deferred compensation to the Plaintiff for the years 1999, 2000, and 2001.
3.    The count's final order entered on July 19, 2001 stand(s) in its entirety.

This order was later amended to substitute $42,457.05 in lieu of $55,057.05.

## The Issues

I.     Whether the trial court erred in determining that the Plaintiff did not materially breach his covenant not to compete;

II.    Whether the trial court should have declared that the Plaintiff forfeited any further right to deferred compensation or other benefits;

III.   Whether the trial court erred in finding that the fees for the 66 tax returns for 1998 amounted to $4300.00, as contrasted to $23,606.94

IV.    Whether the Plaintiff was entitled to vacation and leave pay.

V.     Whether pre-judgment interest was properly disallowed.

## Analysis

At the outset, we are unable to reconcile decretal provision number one to the second provision, which obviously altered the judgment contrary to the denial of the motion to alter or amend. Moreover, the motion was initially granted by order entered March 8, 2002. We are permitted to assume that the inadvertences of these orders pose no consequences.

Our review is *de novo* on the record accompanied with the presumption that as to factual matters the judgment is correct unless the evidence preponderates against it. Rule 13(d) Tenn. R. App. P. Questions of law bear no presumption. ***Guiliano v. Cleo Inc.***, 995 S.W.2d 88 (Tenn. 1999).

## The Breach of Contract

The trial judge found that neither party committed a material breach of either agreement. The preponderance of the evidence supports this finding except with respect to the *sub rosa* preparation by the Plaintiff of 66 tax returns for clients of JJM.

The Plaintiff concedes that in early 1999 he prepared 66 tax returns, for the 1998 tax year, of which twelve were *corporate returns.* He claimed that he had not billed the clients for his services because they were friends, and thus his actions were protected by the agreement. He kept no time records for the work performed. The taxpayers were long-time clients of JJM; in 1998 - for the 1997 tax year - JJM prepared the same returns and received $23,606.94 as compensation therefore. The Plaintiff retained, at his residence, the files pertinent to these clients. He argues that the contract allowed him to prepare tax returns for family and friends so long as he did not receive compensation for the work. Apparently, none of these taxpayers was a family member; all had been clients of the firm for years. There is no proof whatever in the record - other than the testimony of the Plaintiff - that these 66 clients expected that they would not be charged the usual fee for the tax service. We agree with JJM that the Plaintiff deliberately prevented JJM from performing tax-return work for these 66 clients, thus depriving the firm of the revenues, and future good will of these clients. We also agree that in so doing the Plaintiff was competing with JJM in a somewhat flagrant breach of his contractual duty. It is significant that in prior years the Plaintiff never did more than two free tax returns for corporations and rarely did free tax returns for individuals.

As we have observed, we agree with the trial judge that most of the various peccadillos each party accused the other of having engaged in are not material, but we cannot agree that the matter of the 66 tax returns was immaterial.

The contract required the Plaintiff to give his best efforts to the firm. He engaged in a degree of peccancy with respect to the 66 returns apparently relying on the non-billing of them, at least for the time being, as a defense to his actions. Materiality of actions, unless precedent intervenes, is essentially a subjective matter; if, for instance, the Plaintiff had prepared ten returns for friends without charge, and advised JJM that he had done so, no questions reasonably would arise. But we cannot accept that the large number of returns the Plaintiff prepared, ostensibly without charge, can

be attributable to any reason other than machination, and we find that this conduct by the Plaintiff constituted a material breach of his contract.

The trial court relied on the opinion of this Court in **United Brake Systems v. AEP**, 963 S.W.2d 749. Both parties breached a contract, and a significant issue was which party committed the first, uncured breach. To determine this issue, five factors were to be considered: the extent to which the injured party will be deprived of the benefit reasonably expected, the extent the injured party can be compensated, the extent of the forfeiture involved, the likelihood of the defaulting party to cure or offer to cure his failure, and the extent of the defaulting party's behavior as it comports with good faith and fair dealing. The trial court found that the "total value of the tax returns" was about $4300.00; we cannot agree with this finding because the proof is well-nigh irrefutable that the value of the services required to prepare the 66 returns for the *previous* year was $23,606.00, superimposed upon a clear inference that the 1998 return, prepared in1999, required more time. When it is considered that the employment agreement required the Plaintiff to devote the necessary time and best efforts in the performance of his duties for JJM in accordance with Professional Standards, we think it is clear beyond peradventure that the Plaintiff committed a material breach of the conditions of his agreement. We have considered the fact that while the Plaintiff prepared these returns, apparently without billing the clients, and that the contract allowed him to prepare returns for family and friends provided he charged no fee, we are not satisfied from the proof and reasonable inference to be drawn therefrom that such conduct was within the purview of the parties when the contract was executed.

The covenant provides that if the employee [Plaintiff] is found by a court of competent jurisdiction to have materially violated the covenant not to compete, the employee shall no longer be entitled to further payments of deferred compensation. Accordingly, since we have found that the Plaintiff clearly violated the covenant not to compete in a material way, the penalty provision is thereby activated, and the award of deferred compensation is vacated.

JJM argues that the Plaintiff is liable to it for the fees it would have collected during the remaining three years of the Deferred Compensation Agreement if the Plaintiff had not deliberately diverted the 66 secret returns he prepared in 1999. The trial judge allowed JJM to bill for such services, apparently finding that none of the 66 clients had been billed, by the Plaintiff, or had paid for tax services rendered by the Plaintiff. While this decretal provision is somewhat unusual, we see no reason to disturb it, nor to render a judgment against the Plaintiff for a like amount for 2000 and 2001. We note that JJM made pecuniary advances of $10,059.60 to the Plaintiff between August 1, 1998 and December 15, 1998 before JJM learned of the deception practiced by the Plaintiff. We agree the JJM is entitled to a refund of this amount, with interest from December 15, 1998. The Plaintiff was awarded $6360.00 for accrued vacation and leave time. JJM complains that this award is not supported by the evidence because the employment manual - drafted by the Plaintiff - limits the amount of vacation and leave time that carried over from year to year. We agree. The Plaintiff exhausted 213 hours of vacation and leave time after his injury in 1996. JJM argues that simple calculation reveals that the Plaintiff could recover a maximum of 1.42 hours, or $42.00 for unused time, because his calculations did not take into account the carryover limitation. This conclusion

apparently is not seriously controverted by the Plaintiff, since he did not brief the issue. This award is accordingly vacated.

We have considered the remaining arguments by each party and have determined that they are *de minimis*, or have not been presented as issues.

In sum, we find that the Plaintiff materially breached the employment agreement, and that he is not entitled to recover further deferred compensation. We find that the Plaintiff is not entitled to recover the vacation and leave time. We affirm the order allowing JJM to bill for the preparation of the tax returns for 1999, 2000, and 2001, remitting to the Plaintiff his contractual percentile: we affirm the judgment for $297.37: we affirm the judgments pertaining to the Daffron estate and to a trust. The judgments for $42,457.05 and $6360.00 for the Plaintiff are vacated, all as herein provided.

The judgment is modified and remanded for all necessary purposes. Costs are assessed to the Appellee.

_____
WILLIAM H. INMAN, SENIOR JUDGE